UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | Case No. 4:08CR187 CAS (AGF) |
| JULIUS TURRENTINE, | ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on the pretrial motions filed by Defendant, Julius Turrentine. Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). Defendant filed a motion for disclosure pertaining to confidential informants (Doc. #46) and a motion to suppress evidence (Doc. #47). An evidentiary hearing was held on June 25, 2008. The government presented the testimony of Thomas Sawyer, a police officer who has been employed with the St. Louis Metropolitan Police Department (SLMPD) for approximately 20 years, and who has been assigned as a task force officer with the Drug Enforcement Administration (DEA) for more than four years. Defendant presented the testimony of Ralph C. Williams, who is Defendant's nephew. A supplemental evidentiary hearing was held on July 1, 2008, at which the government presented the testimony of Special Agent (SA) James Stroop, who has been employed with DEA for three and one-half years. The witnesses were cross-

examined extensively by opposing counsel.  The parties were given the opportunity to file post-hearing memoranda, after which the matter was taken under advisement.   Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

<u>The Investigation</u>

During Officer Sawyer's approximately 20 years as a police officer, he has been involved in numerous narcotics investigations.  Most recently, as a task force officer with DEA, he has been part of a unit of officers who conduct narcotics investigations which include conducting surveillance, executing search warrants, and interviewing witnesses.  On March 8, 2008, Officer Sawyer was involved in the seizure of approximately 10 kilograms of cocaine and over $1 million in U.S. currency from Stephen Henderson, the co-defendant herein.  The officers had been aware of Henderson for some time, but based on their investigation did not believe that Henderson was the main supplier of the cocaine.  Two days later, on March 10, 2008, Henderson was interviewed and admitted to distributing the 10 kilograms of cocaine.  More specifically, he admitted that he was a distributor for Defendant Turrentine, that he was distributing the 10 kilograms seized at the behest of Turrentine, and that he had been Defendant's distributor for quite some time.  Prior to receiving this information from Henderson, the officers had not previously heard Defendant Turrentine's name in connection with their investigation.  Henderson

also said the money that they had seized was owed to Turrentine. He further advised that Turrentine had been frustrated with him because with the past several payments, Henderson did not have the exact amount. To address the problem, Turrentine advised Henderson that he was going to give him a money counter, and they were scheduled to meet on March 10, 2008. Henderson advised the officers that Defendant resided at 4124 South Grand (the "Residence"), which is the address listed in the search warrant at issue. Officer Sawyer was not aware if Henderson had previously served as an informant, and therefore could not vouch for his credibility based on previous information.

After receiving this information, the officers arranged for Henderson to have a taped telephone conversation with Defendant, in which Henderson and Defendant Turrentine agreed to meet at the Residence. Officer Sawyer did not participate in the telephone call, but did listen to it. Officers also conducted surveillance on the Residence, and observed Defendant enter and leave. Prior to the arranged meeting with Defendant Turrentine, Henderson was outfitted with a KEL recorder, which enabled the officers to monitor the conversation. Henderson thereafter met with Defendant, as planned, and they entered the Residence. Once inside, Defendant showed Henderson a money counter and taught him how to use it. Per Henderson's later account, Defendant retrieved a large quantity of money from somewhere inside the house, which he used to show Henderson how to operate the machine. Defendant also showed him how to clean the money counter and how to detect counterfeit currency. What Officer Sawyer heard on the KEL recorder was consistent with this account and the sounds he heard were consistent with the

3

operation of a money counter.  After the meeting, Henderson met the officers at a pre-arranged location and gave them the money counter he had received.

The officers thereafter conducted additional surveillance at the Residence.  They observed Defendant leave the Residence in the morning and enter a blue van.  At approximately 5:55 p.m. on March 11, 2008, Officer Sawyer, Detective Leo Rice, and a police Sergeant observed Defendant return to the Residence in the same blue van.  At that time, Defendant was placed under arrest for participation in the conspiracy with Henderson.  The officers requested consent to search the Residence.  Defendant refused and specifically directed the officers to get a search warrant.  Defendant was searched incident to his arrest, and keys to the Residence were seized from his person.  Officer Sawyer and Det. Rice then transported Defendant to the DEA office.  Following Defendant's arrest, a team of three or four agents or officers was stationed at the Residence to secure the premises pending the warrant application.  SA Stroop and SA Christensen were stationed in the alley behind the Residence to secure the perimeter, and one or perhaps two officers were also stationed outside at the front of the Residence.  The officers, who were in communication with one another, waited outside the Residence until it was time to execute the warrant, and SA Stroop saw no evidence that anyone was inside during this time period.

At the DEA office, Officer Sawyer and Det. Rice attempted to interview Defendant, but he indicated that he did not wish to make a statement and made no further statements.

4

The Search Warrant and Application

  Officer Sawyer and Det. Rice thereafter began to draft a state search warrant and application. When the documents were complete, they brought the search warrant and application to Judge Mark Neill, who reviewed the application and affidavit. No information was presented to the judge other than what is contained in the warrant, application and affidavit. Det. Rice attested to the information in the affidavit and executed it before the judge, who thereafter signed the search warrant. The warrant reflects signature by Judge Neill at 8:30 p.m. on March 11, 2008. Def. Ex. 1.

  The affidavit in support of the warrant describes Turrentine, and states that he is currently on probation. It further describes the arrest of Henderson, who is referenced as a "cooperating defendant," or "CD," and the seizure at that time of approximately 10 kilograms of cocaine and over $1 million. The affidavit recites that the CD advised that he was a distributor for Turrentine, and that the money seized was owed to Turrentine from the last shipment he received. It also states that the CD advised that he had known Turrentine for approximately 15 years, and had distributed in excess of 800 kilograms of cocaine for Turrentine. It described in detail the manner in which payment was normally made, and the price charged. The CD also identified, by name, another distributor of Turrentine's and recited that the CD had been present when Turrentine had distributed several kilograms of cocaine to that distributor. He said he and the other distributor would normally split each shipment evenly, and that each shipment would usually be in the 100-200 kilogram range. He estimated that he had distributed in excess of 800

5

kilograms of cocaine for Turrentine. The CD further stated that he was scheduled to meet with Turrentine on March 10, 2008, so that Turrentine could give him a money counter. He explained that Turrentine wanted to give him a money counter because he was frustrated by the fact that the CD's money count was always wrong.

The affidavit further recites that on March 10, 2008, the CD placed a recorded phone call to Turrentine, and arranged a meeting. Prior to the meeting, the CD was equipped with a KEL recording device. The meeting took place at Turrentine's residence at 4124 S. Grand, and during the meeting Turrentine demonstrated how to operate the money counter which he was giving to the CD. The CD stated that Turrentine had retrieved a large sum of U.S. currency from an unknown location inside the Residence and started counting it in the money counter. Turrentine also explained how to determine if money was counterfeit. The CD took the money counter and left the Residence and thereafter went to a predetermined location where he turned over custody of the money counter.

Based upon this information, the judge signed the warrant, which authorized the search of 4124 South Grand and the seizure of U.S. currency, drug transaction records, other documents and any instruments of the crime believed to have been used as a means for committing the felony of VMCSL (Violation of Missouri Controlled Substances Law) distribution of cocaine. See Govt. Ex. 1; Def. Ex. 1.

Execution of the Warrant

After the warrant was signed, Officer Sawyer and Det. Rice contacted the team,

who thereafter put on their gear and met at a gathering point around the corner from the Residence. Officer Sawyer estimated that it took approximately 45 minutes to travel from the area near Highway 44 and Lindbergh and assemble for execution of the warrant. Based on that estimate, and the time of 8:30 p.m. shown on the warrant, he further estimated that it was between 9:15 and 9:30 p.m. when they executed the warrant. Officer Sawyer and Det. Rice had maintained the keys that had been seized from Defendant at the time of his arrest, and they used these keys to make entry. Def. Exs. 5 & 7. No officers made entry into the Residence prior to this time.

No one was inside the Residence. During the search, the officers observed that there were surveillance cameras installed at the Residence, capturing several different views, including the front of the Residence. Multiple views from the cameras were displayed on a monitor with a four-picture split screen located inside a bedroom. Def. Ex. 8. The officers did not believe that any recording was being made from the cameras. The monitor also displayed a date and time. At the time it was photographed by the officers, the monitor displayed a date of 03/12/08 and a time of 19:57:24. Def. Ex. 8. In connection with their search, the officers located and seized five money counters, certain paperwork, ammunition, and $542,199 in currency. They also seized a bottle of Dormin,[1] which was determined to contain a quantity of cocaine consistent with personal use. Officer Sawyer also believed that they also may have seized the surveillance cameras and

---

[1] Officer Sawyer acknowledged that this bottle was not reflected on the search warrant inventory.

monitor, but did not know what had happened to that equipment.

During the execution of the search warrant, SA Stroop and SA Eric Lamb took digital photographs of the scene, including Def. Ex. 8 and the other photographs admitted into evidence at the hearing. On or about March 13, 2008, the photographs were downloaded onto the DEA computer, in a file related to the case. The date and time the photographs were taken were recorded by the camera and are reflected in the computer file. Following the initial hearing, SA Stroop examined the computer file, and made a print out of the information pertaining to the photographs. The information from the digital camera reflected that the photographs were taken between 9:21 p.m. and 9:53 p.m. on March 11, 2008. Govt. Ex. 2. The time reflected for the photograph marked as Ex. 8 is 9:26 p.m. Id. To assess the accuracy of the camera's clock, SA Stroop thereafter took a picture with the camera and checked the time, and determined that the time recorded by the camera was nine minutes fast. No service or manipulation of the camera had been performed between the March 11, 2008 date of the search and the date when SA Stroop performed this check of the camera.

Referencing the time reflected on the monitor shown in Def. Ex. 8, Defendant asserts that the officers must already have been inside the Residence at 7:57 p.m. – which was prior to the time the judge issued the warrant. He therefore contends that the search was executed without a warrant, and that all items seized should be suppressed. Defense counsel explains the inaccurate date of 3/12/08 reflected on the monitor by the fact that 2008 was a leap year, for which the surveillance system likely had not adjusted. The

8

Court does find, as requested by Defendant, that 2008 was a leap year, and takes judicial notice of the fact that if Defendant's surveillance system did not automatically adjust for leap year, it would have shown a date one day later – or March 12, 2008. The Court also takes judicial notice of the fact that in 2008 daylight savings time went into effect on March 9, 2008, at 2:00 a.m., moving the clock ahead by one hour. As such, if the surveillance system inside the Residence also did not automatically adjust for daylight savings time, the time of 19:57 would actually have been one hour later, or 8:57 p.m., which was after the warrant was issued.

Ralph Williams, Defendant's nephew, testified that he visited the Residence approximately twice per week, and that he had seen the date and time on the monitor at some point in March, prior to the search. He believed that either the date or time was incorrect, but could not recall which of the two was incorrect. With further prodding, he testified that if the date was incorrect, then he believed the time would have been correct. There was no evidence with regard to whether that observation took place before or after daylight savings time went into effect.

To the extent Mr. Williams' testimony may be deemed to be inconsistent with that of the officers, this Court, based upon all of the evidence and having observed the witnesses and their demeanor, credits the testimony of the officers over that of Mr. Williams. The Court does not find the testimony of Mr. Williams to be credible and indeed finds his testimony with regard to the taking of certain other photographs to be not credible. Moreover, without evidence regarding whether Mr. Williams observed the

monitor before or after daylight savings time, his testimony regarding the accuracy of the monitor is of questionable use. On the other hand, the Court found the testimony of Officer Sawyer and SA Stroop with regard to the time when they executed the warrant to be credible. Their testimony is also corroborated by the data captured by the DEA camera. As such, the Court finds that the photographs were taken by the officers between approximately 9:12 p.m. and 9:44 p.m. (accounting for the fact that the camera was running approximately nine minutes fast), and further finds, as a factual matter, that no officers entered the Residence prior to the issuance of the search warrant on March 11, 2008.[2]

## CONCLUSIONS OF LAW

### A. Validity of the Search

Defendant makes essentially two arguments in support of his motion to suppress. Relying on the time reflected on the monitor in Def. Ex. 8, Defendant contends that the search was unlawful because the officers entered the Residence prior to the issuance of the warrant. As set forth above, however, the Court rejects, as a factual matter, Defendant's contention that the officers entered the Residence prior to the issuance of the warrant. As such, this challenge to the search has no basis, and fails.

---

[2] If one assumes Defendant's surveillance system was not adjusted for daylight savings time, there is only a twenty minute difference between the time reflected on Defendant's monitor (8:57) and the adjusted time recorded by the DEA camera (9:17). And the time reflected on Defendant's monitor would still be well after the warrant was signed by Judge Neill.

Defendant also argues that the affidavit in support of the search warrant is deficient and fails to provide probable cause for the search. In support of this contention, Defendant highlights that the officers had no prior experience with the confidential source (identified as Henderson at the hearing) and that the affiant did not specifically state that he had listened to either the recorded telephone call or the KEL wire of the meeting with Defendant. In connection with this argument, Defendant relies primarily on the case of United States v. One Parcel of Property, 774 F. Supp. 699 (D. Conn. 1991).

To be valid, a search warrant must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, contraband, or a person for whose arrest there is probable cause, may be found in the place to be searched. Warden v. Hayden, 387 U.S. 294 (1967); Johnson v. United States, 333 U.S. 10 (1948); Fed. R. Crim. P. 41. The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions. "In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175 (1949). Probable cause is "a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). Applications and affidavits should be read with common sense and not in a "grudging" or "hypertechnical" fashion. United States v.

Ventresca, 380 U.S. 102, 108-9 (1965).  Probable cause may be found in hearsay statements from reliable persons, Gates, 462 U.S. at 245; in hearsay statements from confidential informants corroborated by independent investigation, Draper v. United States, 358 U.S. 307, 313 (1959); or in observations made by trained law enforcement officers, McDonald v. United States, 335 U.S. 451, 454 (1948).  While these are some of the ways in which probable cause is commonly established, they are by no means all-inclusive.  Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented.  Gates, 462 U.S. at 230.  Once a judicial officer has issued a warrant upon a finding of probable cause, that finding deserves great deference if there is a substantial basis for the finding.  Id. at 236.

Turning to the specific context at issue, the courts have recognized that a probable cause finding may properly be based upon information from a confidential informant if either the informant has a history of providing reliable information, or the information is at least partially corroborated.  See United States v. Williams, 477 F.3d 554, 559-60 (8th Cir. 2007); United States v. Wold, 979 F.2d 632, 635 (8th Cir. 1992).  As the Court explained in United States v. Williams, 10 F.3d 590 (8th Cir. 1993), "If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable."  Id. at 593-94 (citing Gates, 462 U.S. at 233-34; Draper, 358 U.S. at 313).

Here, although the confidential informant had not provided information in the past,

his information was corroborated by the officer's independent investigation, including the monitored telephone call, in which the informant was able to arrange a meeting with Defendant; the informant's meeting with Defendant at the place informant had identified as Defendant's residence; and the electronically-monitored meeting at which Defendant gave the informant a money counter, instructed him as to its use, used it to count cash, and instructed him how to detect counterfeit funds. This is sufficient to provide a substantial basis for the judge's finding of probable cause. See United States v. Coleman, 349 F.3d 1077, 1083 (8th Cir. 2003) (probable cause for warrant found, though information from confidential informant that had been received from anonymous source, where there was partial corroboration in various other ways). Although Defendant challenges this corroboration based on the fact that the affiant did not expressly state that he had listened to the taped telephone call or listened to the meeting recorded on the KEL wire, the undersigned believes the affidavit may fairly be read to imply same, and should be so interpreted. See Ventresca, 380 U.S. at 109.

In addition to the officers' independent investigation corroborating the informant's information, there are also other factors present here which courts have recognized serve to support the credibility of informant information. For example, it is clear from the affidavit that the CD's information was both detailed and based on first-hand observations. See United States v. Warford, 439 F.3d 836, 842 (8th Cir. 2006) ("[T]here is an inherent indicia of reliability in the richness and detail of a first hand observation." (internal quotation omitted)). The informant also implicated himself in a long-standing

13

trafficking scheme, that was far more substantial than the single incident for which he was arrested. See United States v. Pennington, 287 F.3d 739, 742-43 (8th Cir. 2002) (recognizing that fact that informant implicated himself in criminal activity tends to support a finding of probable cause to search); United States v. Buckley, 4 F.3d 552, 555-56 (7th Cir. 1993) (probable cause to search mobile home established in part because confidential informant admitted she purchased cocaine from the defendants at least 25 times in the previous six months, and indicated she had seen cocaine and firearms inside the mobile home). Further, following his arrest the informant was interviewed in person by law enforcement officers who therefore had the opportunity to assess his credibility. See United States v. Neal, 528 F.3d 1069, 1074 (8th Cir. 2008) (noting reliability of informant strengthened if informant meets officers in person); United States v. Bell, 480 F.3d 860, 863 (8th Cir. 2007) (holding that informant's reliability is strengthened if informant meets with officer in person and is willing to provide his own personal information). These factors, in combination, therefore also provide substantial support for the informant's credibility. See United States v. Ball, 499 F.3d 890, 896 (2007) (holding that reliability of informants was supported by fact that they were heavily involved in conspiracy, had first-hand knowledge, and made statements against their penal interest); United States v. McAtee, 481 F.3d 1099, 1102-03 (8th Cir. 2007) (same). The affidavit here also recites that Defendant was currently on probation.

The Court is unpersuaded by the reasoning in United States v. One Parcel of Property, the main case relied upon by Defendant. That court's holding with regard to

the existence of probable cause does not appear to be consistent with the holdings of the Eighth Circuit cases cited above.³  In any event, however, the case is distinguishable.  In One Parcel, the warrant at issue was for the search of a house, and the court there found the only evidence of transactions in the house to be stale, having occurred at the start of the informant's relationship with the target approximately three years previously. Although there had been a recent seizure of narcotics, it was seized from a car, which the court found did not provide support for a belief that cocaine could be found in the residence.  In contrast to those facts, here Henderson's transactions with Defendant were not stale.  Indeed, the more than $1 million seized from Henderson just two days before was owed to Defendant.  Further, Henderson had seen Defendant retrieve a large quantity of cash from inside the Residence just one day prior to the issuance of the warrant, which information was corroborated by the officers' investigation.  Also, in One Parcel, the government conceded that the warrant was overbroad, which is not the case here.  Id. at 704.

---

³ One could easily argue that One Parcel reflects the type of "grudging" and "hypertechnical" analysis against which the Supreme Court has cautioned.  The Court further notes that the case has been cited by only four other courts, none of which are in the Eighth Circuit.  It was distinguished by one such court.  See United States v. Gotti, 42 F. Supp. 2d 252, 275 (S.D.N.Y. 1999) (distinguishing One Parcel).  While its analysis of overbreadth was cited in United States v. Smith, 2006 WL 4599653, at *7 (W.D.N.Y. 2006), that portion of the Report and Recommendation was not later adopted, see United States v. Smith, 2007 WL 2088938, at *3 (W.D.N.Y. 2007).  And the few cases that have cited One Parcel have done so not for its analysis of probable cause, but rather with regard to its discussion of overbreadth and the application of Leon to a search warrant which, in the case of One Parcel, the government admitted was overbroad.

But even if probable cause were found to be lacking in the warrant – a finding this Court does not make – the evidence would still be admissible under the "good faith" exception, as the affidavit and application at issue here were sufficient for the executing officers reasonably to believe that probable cause existed.  See United States v. Leon, 468 U.S. 897, 923 (1984); United States v. Marion, 238 F.3d 965, 969 (8th Cir. 2001); United States v. Johnson, 219 F.3d 790, 791 (8th Cir. 2000); United States v. Rugh, 968 F.2d 750, 753 (8th Cir. 1992).

The Supreme Court has recognized that the exclusionary rule does not operate to exclude evidence seized by law enforcement officers acting in reliance on a warrant issued by a neutral and detached judge, though the warrant is later determined to be invalid, when the officers' reliance is objectively reasonable.  Leon, 468 U.S. at 922; Massachusetts v. Sheppard, 468 U.S. 981 (1984).  "When assessing the objective [reasonableness] of police officers executing a warrant, we 'must look to the totality of the circumstances,' including any information known to the officers but not presented to the issuing judge."  Marion, 238 F.3d at 969 (quoting United States v. Simpkins, 914 F.2d 1054, 1057 (8th Cir. 1990) (citation omitted)).

The Eighth Circuit has applied the "good faith" exception to facts substantially similar to those presented here.  Applying Leon, the Court has refused to suppress seized evidence, notwithstanding defendant's argument that the affidavit fails to provide facts corroborating the reliability of information provided by a confidential and cooperating informant, finding that it was reasonable under these circumstances for officers to rely on

16

a neutral judge's finding of probable cause. See United States v. Pruett, 501 F.3d 976, 982 (8th Cir. 2007) (holding that it was reasonable for officers to rely on judge's finding of probable cause though affidavit was based on uncorroborated statements of a confidential informant), vacated on other grounds, 128 S.Ct. 1473 (2008) (vacated regarding "use" of firearm); United States v. Hallam, 407 F.3d 942, 946 (8th Cir. 2005) (holding Leon applicable though both parties agreed that affidavit failed to provide sufficient facts establishing reliability of statements of "cooperating individual," where affidavit provided "some fairly specific information in the form of the first-hand observation of the unnamed informant that the methamphetamine would be found at the residence"). Here the affidavit provided detailed and specific information for the judge's assessment. And any ambiguity regarding whether the officers actually listened to the monitored conversations is addressed by the fact that the executing officers knew they had listened to the conversations. It was therefore reasonable for the officers to rely on the judge's finding of probable cause. As such, even if probable cause were lacking, the evidence would still be admissible under the Leon good faith exception.

### B. Motion for Disclosure

Defendant filed an extensive motion requesting the disclosure of various categories of information pertaining to confidential informants, informers, cooperating individuals and implanted infiltrators. (Doc. #46). Following the initial hearing, the parties conferred, and reached an agreement with regard to almost all of the information requested. (Doc. #68). The undersigned commends the parties for their detailed and

17

productive efforts in this regard.

The sole issue that remains for court resolution relates to paragraph 11 of Defendant's request, which seeks the disclosure of the nature of any past or present relationship between any informant utilized in the investigation of this case and any federal agency, including the F.B.I., C.I.A., I.R.S., D.E.A., etc. Defendant clarified that he seeks information pertaining to relationships with any federal agency any informant used in this case may have had, including matters unrelated to the investigation at issue.

The government responded, confirming its agreement with Defendant to disclose the identity of the confidential informants prior to trial, as required by <u>Roviaro v. United States</u>, 353 U.S. 53 (1987). The government also represented at the hearing that it would make any such informants available prior to trial for the defense to interview. The government further confirmed that it was aware of its responsibilities to produce favorable evidence under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and impeaching evidence under <u>United States v. Bagley</u>, 473 U.S. 667, 676-77 (1985) and <u>Giglio v. United States</u>, 405 U.S. 150, 154-55 (1972). The government has agreed to disclose such evidence, and to produce any Jencks materials.[4] To the extend Defendant seeks

---

[4] The Court assumes from the government's response and representations that in meeting this obligation, the government will review any such relationships any informant may have with such federal agencies to determine the existence of any exculpatory or impeaching information. To the extent the government has any question regarding a disclosure requirement pertaining to this information, the government may file said documents with the court for <u>in</u> <u>camera</u> review.

18

information not covered by Brady or Giglio pertaining to other investigations in which any informant has been utilized, in the past or presently, however, the government objects, especially as such disclosures could potentially jeopardize other investigations.

In this case, the government has agreed to produce to Defendant all information it is required to produce. To the extent Defendant seeks information beyond what has been offered, the Court notes that Defendant has not shown that such information is material or necessary to his defense, nor has he demonstrated a legal basis for the request. On this record, therefore, Defendant's request shall be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Physical Evidence [Doc. No. 47] be **Denied**.

**IT IS HEREBY ORDERED** that Defendant's motion for disclosure [Doc. No. 46] be **Denied**, based upon this Court's finding that (i) the parties have resolved all disputes pertaining to the motion, other than the information requested in paragraph 11, and (ii), the government has agreed to produce all information it is required to produce within the scope of paragraph 11.

The parties are advised that they have ten (10) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may

result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

_____
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 23rd day of July, 2008.