UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
     vs.                         )
                                 )     Case No. S1-4:08CR187 CAS (AGF)
JULIUS TURRENTINE and            )
STEPHEN HENDERSON,               )
                                 )
          Defendants.            )


**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motions filed by Defendants Julius

Turrentine and Stephen Henderson.  Pretrial matters were referred to the undersigned

United States Magistrate Judge under 28 U.S.C. § 636(b).  On March 20, 2008,

Defendants were indicted in a two-count indictment.  Count I charged Defendants

Turrentine and Henderson with conspiracy to distribute and possess with intent to

distribute cocaine.  In Count II, Henderson only was charged with the distribution of

cocaine on Mach 5, 2008.

In response to the Indictment, Defendant Henderson initially filed motions to

suppress, but on May 20, 2008, Henderson withdrew his previously filed motions and

waived his right to proceed on motions and to an evidentiary hearing.  (Doc. #52).

Defendant Turrentine filed a motion to suppress and a motion for the disclosure of

information pertaining to confidential informants. Following an evidentiary hearing on Defendant Turrentine's motions, the undersigned issued a Report and Recommendation, recommending that Defendant's motion to suppress be denied, and ordering that Defendant's motion for disclosure be denied (Doc. #74), which Report and Recommendation was sustained and adopted by the Honorable Charles A. Shaw on August 14, 2008. (Doc. #79).

The government thereafter filed a superseding indictment, adding three new charges against Defendant Turrentine: conspiracy to commit money laundering; conspiracy to structure transactions to evade reporting requirements; and structuring transactions to evade reporting requirements. The superseding indictment also added, as Count VI, a request for criminal forfeiture against both Defendants. In response thereto, Defendant Henderson filed a motion to sever the charges against the two Defendants. (Doc. #92). Defendant Turrentine likewise filed a motion to sever Defendants (Doc. #93), and also filed a motion to sever offenses, requesting that the charge of Count I be severed from the money laundering and structuring claims in Counts III - VI. (Doc. #94).

A hearing on the motions to sever was held on October 7, 2008. At that time, the government conceded that certain statements made by Defendant Henderson that it intended to use at trial required that the two Defendants be tried separately. The government therefore did not object to either Defendant's motions to sever parties. The government opposed, however, Defendant Turrentine's motion that the charge in Count I be tried separately from the remaining charges against him.

Although the superseding indictment did not raise any new arguably suppressible incidents as to Defendant Henderson, the Court thereafter permitted Defendant Henderson to file motions to suppress, based on the representation of defense counsel that at the time of the earlier waiver hearing, counsel was mistaken in his belief that Defendant had actually seen and had an opportunity to review all of the discovery. (Doc. #108).[1] An evidentiary hearing on Defendant Henderson's motion to suppress was held on October 14, 2008. The government was represented by Assistant United States Attorney Tiffany G. Becker. Defendant Henderson was present and represented by his attorney, Gilbert C. Sison. At the hearing, the government presented the testimony of Task Force Officer (TFO) Jason Staats, who has been an officer with the Florissant Police Department for approximately nine years, and at all times relevant hereto was a Task Force Officer with the Drug Enforcement Administration (DEA). Defendant presented the testimony of James Hayes, a forensic document examiner, and of R. Scott Rosenblum, who is co-counsel of record for Defendant Henderson in this case. In rebuttal, the government presented the testimony of Special Agent (SA) Lonnie Parrish, who has been employed as an agent with the DEA for almost ten years. The parties were given leave to file post-hearing memoranda, after which the matter was taken under advisement. Trial is scheduled for December 1, 2008.

---

[1] After filing his motion to suppress, Defendant again indicated that he wished to withdraw his motion and waive his right to an evidentiary hearing, but at the end of the Court's colloquy with Defendant, Defendant withdrew his waiver and requested a hearing.

Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

In 2008, SA Parrish and TFOs Staats and Harold Watson were part of a larger investigative team investigating a drug trafficking operation that involved Defendant Stephen Henderson.  During the course of their investigation, they had associated Henderson with several locations, including a residence on Bon Jour Court and a specific apartment at 7301 Sieloff, both located in the Eastern District of Missouri.  On March 5, 2008, in connection with their investigation, the investigative team monitored a transaction involving the delivery by Henderson of 10 kilograms of cocaine to a confidential informant.  Hoping to move up the chain to identify the sources of supply as high as they could, the agents did not arrest Henderson at that time, but rather continued to conduct surveillance.

On March 10, 2008, the investigative team made the decision to arrest Henderson, based on the transaction they had observed on March 5, 2008, and the agents conducted surveillance at multiple locations in an effort to effect the arrest.  The agents had also obtained a search warrant for the Bon Jour Court address, which other members of the team executed that day.  At approximately 9:00 a.m., TFO Staats began surveillance outside the Sieloff apartment, which the agents had learned was leased to a Ms. Stackhouse, whom they had also observed coming to and leaving from the apartment.

After he arrived at the Sieloff apartment, TFO Staats observed one of the vehicles Henderson used.  He advised the team, and other agents arrived to continue the surveillance at that location.  The agents were dressed in plain clothes, with raid jackets that identified them with DEA, and were wearing their sidearms.

At approximately 1:00 p.m., the agents observed Henderson leave the apartment and walk toward his car.  The agents approached Henderson, arrested him, patted him down, and placed him in handcuffs.  TFO Watson advised Henderson of his <u>Miranda</u> rights from a card that he keeps with him.  At some point Henderson was also advised that the agents had a search warrant for the Bon Jour address.  At the time he was advised of his rights, Henderson did not appear to be under the influence of any drugs or alcohol. He appeared to understand what was being said, and he acknowledged that he understood his rights.  They discussed possible cooperation with Henderson and Henderson indicated that he was willing to cooperate.  Either at this time or during their later conversation, Henderson was likely told that he could help himself by cooperating.  Not wanting to conduct their conversation on the public street, the agents asked if they could go inside and discuss the matter, and Henderson agreed.

Henderson had several sets of keys on his person, which the agents had located at the time of his arrest, and Henderson showed the agents which key to use to open the apartment.  Inside the Sieloff apartment, Henderson was placed on the couch, and his handcuffs were moved so that he was cuffed in front.  They asked Henderson whether he would consent to let them search the apartment, and he agreed.  TFO Staats had retrieved

a consent to search form that he had in his car, and TFO Staats filled in the information regarding the location on the form. Unsure how to spell the street address, he asked Henderson for the proper spelling, which he provided. He and TFO Watson presented the consent to search form to Henderson, which he freely signed. At the time, Henderson was still seated on the couch, and either both hands were still cuffed in front of him or TFO Watson had removed the cuffs from one of his hands. TFO Watson held out the form while Henderson signed it. His signature was witnessed by TFO Watson and TFO Staats. No threats, promises or misrepresentations were made to obtain Henderson's consent.

Neither the testimony of Mr. Hayes, the forensic document examiner called by Defendant, nor this Court's own examination of the original document,[2] causes the Court to doubt whether the consent to search form was actually signed by Henderson. Other than the signatures contained on Defendant's bond, which was presumably signed in open court (see Def. Ex. B, pp. 1 & 6), no foundation, whatsoever, was laid for the exemplars Mr. Hayes used for comparison.[3] Even if one assumes, however, that all of the exemplars

---

[2] The consent to search form bearing the parties' original signatures was marked and admitted as Govt. Ex. 4, and examined by the Court. The original was then returned to government's counsel who shall maintain the original in connection with further proceedings in this case. An examination of the original is useful, as it is clear on the original, but not the photocopy, that a line trails up and to the right from or as part of the signature.

[3] In his post-hearing memorandum, defense counsel states that he obtained the exemplars marked as Def. Ex. D.

that appear in Def. Exs. B and D were signed by Henderson, the only opinion Mr. Hayes could offer was that, based upon his examination, he could not identify or eliminate Henderson as the author of the signature on the consent to search form. While he saw nothing to point to it being by the same author as the exemplars, he could not say Henderson did not sign the consent to search form, and acknowledged that it was possible the signature was his. Mr. Hayes further acknowledged that one's signature can be affected by circumstances; that a stressful situation could affect one's handwriting; and that the facts surrounding the signing at issue here were the type of "stressful" circumstances that could impact Henderson's signature. Finally, Mr. Hayes acknowledged that if Henderson were handcuffed at the time he signed the form – a fact the Court finds indeed existed here – that "certainly" could affect the appearance of Henderson's signature.

After Henderson signed the consent to search form, some of the agents proceeded to search the apartment, while TFOs Watson and Staats spoke with Henderson. Henderson's manner was very cooperative, and he advised them where the money was located in the Sieloff apartment, directing them to a nylon duffel bag in the closet. He also advised them where additional money could be found at another location, discussed amounts of money that were owed, and at some point stated, "This is bigger than you think." During their search of Henderson incident to his arrest, the agents also located a piece of paper in Defendant's wallet, with telephone numbers, other numbers, and circles, and Henderson explained the paper listed people who owed him money and in some

instances listed amounts of drugs. The agents seized more than $250,000 at the Sieloff

address, and more than $900,000 from another location.[4]

The consent search at Sieloff was completed quickly, within 20 - 30 minutes. This

was because Henderson was in a hurry to get them out of the apartment, as either

Stackhouse or his or her son was expected to arrive soon, and Henderson did not want to

be seen in cuffs. The agents then transported Henderson to the DEA headquarters in

downtown St. Louis, where SA Parrish and TFOs Sawyer and Staats interviewed him

further. Prior to conducting the interview at the DEA headquarters, SA Parrish again

advised Defendant of his rights from a card that he keeps with him. Government Ex. 2 is

a copy of the form of advice of rights card used. At the hearing, SA Parrish read those

rights into the record as he had read them to Defendant that afternoon. Again, Defendant

did not appear to be impaired in any fashion, appeared to understand what was being

said, and his answers were responsive. No threats or intimidation, promises or

misrepresentations were made to induce Defendant's statement or his waiver of rights.

Defendant was told that if he cooperated that would help him out. He was further

advised that any cooperation would be related to the U.S. Attorney, and that it would

come down to what the Assistant U.S. Attorney (the "AUSA") and the court decided with

regard to his cooperation. He also advised Henderson that the more cooperation he

provided, the better. SA Parrish did not tell Defendant that he would get probation if he

---

[4] It is not entirely clear whether this $900,000 amount was found at the Bon Jour address or another location.

cooperated, nor did he make any estimate or guess as to what his sentence might be. Henderson stated that he understood his rights and agreed to speak with the agents. He thereafter participated in a lengthy interview with agents, and attempted other cooperation, including monitored telephone calls which did not prove successful.

The next morning, Henderson was supposed to meet with the agents. SA Parrish, agent John Christensen and TFO Staats met with Henderson, and had planned to follow him downtown to DEA headquarters to begin their operations for the day. Somewhere along the way, however, Defendant instead began driving to the office of N. Scott Rosenblum, who is his attorney of record in this matter. TFO Staats believes they may have called Henderson and asked him where he was going, and Henderson stated he wanted to talk to his lawyer first. The agents agreed, and followed Henderson to Mr. Rosenblum's office where they waited in their cars. Mr. Rosenblum pulled up behind Henderson's car a few minutes later. From the testimony it appears that this was Henderson's first contact with Mr. Rosenblum regarding this matter, but the record is not entirely clear in this regard. Mr. Rosenblum, perhaps having gotten the number from Defendant, either called the agents or spoke to them and said he wanted to speak with Henderson, and the agents agreed. TFO Staats then left, and SA Parrish and agent Christensen remained and waited while Mr. Rosenblum and Henderson met. After he finished meeting with Henderson, Mr. Rosenblum re-contacted the agents and said they could come in, further indicating that he wanted to get a proffer letter signed.

The two agents joined Defendant and Mr. Rosenblum in his office. Mr.

Rosenblum wanted to clarify in his own mind an understanding (presumably expressed by Defendant), which appeared odd to him, that if Defendant continued to cooperate he could be possibly looking at probation, and he asked the agents if they had represented to Henderson that he would be looking possibly at probation.[5] SA Parrish responded that they did not make such a promise. There is conflicting testimony with regard to what was said next. Mr. Rosenblum testified that SA Parrish said something like, "Could your client live with a year or so if he continued to cooperate and the cooperation continues to go well?" SA Parrish testified that Mr. Rosenblum stated something like, "but you have heard or seen good things happen before, and have seen some people get one or two years," and Mr. Parrish in response to his question agreed and said anything is possible. Both witnesses agreed that SA Parrish further stated that if the cooperation continued to go well, he would share that fact (the cooperation) with the AUSA, and SA Parrish reiterated that he could not bind the AUSA. SA Parrish did not make any promises regarding what sentence Henderson might receive, and at no time was any specific deal discussed. It was made clear to Henderson, both by SA Parrish and Mr. Rosenblum, that at that time the government was not entering into any agreement with Henderson.

For purposes of this motion, however, it is unnecessary for this Court to resolve exactly how the statement regarding a possible sentence of a year or so arose. There is no

---

[5] At the hearing, Mr. Rosenblum limited his testimony to the discussion that took place in the presence of the agents, and he declined and specifically objected to testifying about any conversation he had with Henderson before the meeting with the agents.

evidence, whatsoever, that SA Parrish ever promised Henderson that he would receive probation, and the Court specifically finds that he did not. Nor is there any evidence that SA Parrish made any representations to Henderson on March 10th regarding the possibility of receiving a sentence of "a year or so" in order to induce Henderson's waiver or his statements on that date. At the hearing, Mr. Rosenblum acknowledged that he was not privy to what happened on March 10, 2008, and did not know when any alleged statements regarding the effect of Defendant's cooperation were made. If at any time Defendant was under the impression that he might receive a particular sentence in exchange for his cooperation, that impression was dispelled by the agents and his own attorney at the March 11, 2008 meeting in Mr. Rosenblum's office.

At that meeting, Mr. Rosenblum contacted the U.S. Attorney's office, and a proffer letter was sent by fax to his office by AUSA Sam Bertolet. See Gov't Ex. 3. The letter agreement admitted into evidence at the hearing is not signed, and it is unclear whether the document was signed and returned to the U.S. Attorney's office, as the cover sheet requests.

At no time during the meeting with the agents did either Henderson or Mr. Rosenblum assert that Henderson's rights had been violated the previous day with regard to obtaining a consent to search; Henderson did not complain about the search of the Sieloff apartment, nor did he contend that he had never signed the consent to search form.

## CONCLUSIONS OF LAW

## I.  MOTION TO SUPPRESS OF DEFENDANT HENDERSON

### A.  <u>Validity of Arrest</u>

In a footnote in his post-hearing memorandum, Defendant for the first time challenges the validity of the arrest itself, further asserting that the illegal arrest taints any consent the officers subsequently obtained.  Defendant does not contest that the monitored transaction on March 5, 2008 gave rise to probable cause for an arrest; rather, Defendant asserts that a warrantless arrest was not authorized because the incident giving rise to the arrest occurred five days earlier.  Although Defendant did not raise this issue in his written motions or at the hearing itself, the Court will nonetheless address Defendant's argument, but finds that it has no merit.

The investigation with regard to Defendant Henderson was an on-going one. "[I]ndividuals under investigation have no right to arrest once probable cause arises; the timing of that arrest is up to the investigating officers."  <u>United States v. Davis</u>, 21 F. Supp. 2d 979, 988 n.9 (D. Minn. 1998), <u>aff'd</u>, 174 F.3d 941 (8th Cir. 1999).  As the Supreme Court has recognized:

> There is no constitutional right to be arrested. . . . The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.

Hoffa v. United States, 385 U.S. 293, 310 (1966) (footnote deleted).  As such, "[a]

warrantless arrest is not to be declared invalid merely because the arresting officer had

time to obtain a warrant before apprehending the suspect."  United States v. Montos, 421

F.2d 215, 225 (5th Cir. 1970).  It is equally well-settled that "probable cause to arrest,

once formed will continue to exist for the indefinite future, at least if no intervening

exculpatory facts come to light."  United States v. Watson, 423 U.S. 411, 449 (1976).

The agents were therefore entitled to continue their surveillance of Henderson as part of

their ongoing investigation.  See United States v. Johnson, No. 03-20013-01-JWL, 2003

WL 21250673, at *5 (D. Kan. May 28, 2003) (upholding warrantless arrest based on

controlled purchase of narcotics that occurred six weeks prior to arrest, where officers

delayed arrest to continue investigation of others they believed were involved with the

defendant).  Inasmuch as the officers were not required to arrest Defendant immediately

following the narcotics transaction they observed, Defendant's argument that the consent

search was tainted by the arrest also fails.

### B.  Consent Search

Henderson also argues that he did not sign the consent to search form and that any

consent to search purportedly given by him was not voluntary.  At the outset, the Court

rejects as a factual matter Henderson's contention that he did not actually sign the

consent to search form.  To the contrary, as set forth in the above statement of facts, the

Court expressly finds that he did in fact execute the consent to search form.  The Court

also rejects Defendant's assertion that the consent was not voluntary.

13

When officers conduct a warrantless search, it is the prosecution's burden to prove by a preponderance of the evidence that a consent to search was freely given.  United States v. White, 81 F.3d 775, 780 (8th Cir. 1996); United States v. Miller, 20 F.3d 926, 930 (8th Cir. 1994).  A consent is voluntary if it is the product of free choice, the defendant's will is not overborne, and the consent is not given under coercion or duress. In determining whether the prosecution has met its burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given.  United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). Voluntariness is a fact question to be determined from the totality of the circumstances present. Schneckloth, 412 U.S. at 226-227; United States v. Matlock, 415 U.S. 164 (1974).  The factors to be considered in determining whether consent is voluntary include:

> (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his Miranda rights prior to the consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

United States v. Alcantar, 271 F.3d 731, 737 (8th Cir. 2001); accord, United States v. Hathcock, 103 F.3d 715, 719-20 (8th Cir. 1997); Chaidez, 906 F.2d at 381.  Among the factors to be considered in examining the environment surrounding the consent, courts examine:  the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied upon promises or misrepresentations made by the police; whether the defendant

was in custody; whether the consent occurred in a public or secluded location; and whether the defendant objected to the search or stood silently by while the search occurred.  United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001); Chaidez, 906 F.2d at 381.  The foregoing factors are not to be applied mechanically, and no single factor is dispositive.  Schneckloth, 412 U.S. at 226-27; Chaidez, 906 F.2d at 381.

At the time of the search in question, Henderson was a 37 year old adult and, having previously been convicted, he had prior experience with law enforcement.  He was not then under the influence of drugs or alcohol, and appeared to understand what was being requested of him.  Although Defendant was under arrest at the time, the request for consent to search was made almost immediately after his arrest and no threats or promises were made to induce the consent.  In the written consent to search signed by him, Defendant expressly acknowledged that the consent was freely given, and that he had not been threatened or forced in any way.  After signing the form, Defendant cooperated with the officers, to the point of identifying for them where the cash could be located, and at no time during the search did he object to the search or withdraw his consent to search.  The voluntary nature of his consent is further confirmed by Defendant's failure to raise any objections to the search in his meeting with counsel and the agents the following day.  Thus, based on all of the circumstances, the Court finds that Defendant voluntarily consented to the search of the Sieloff apartment, and there is no suggestion that the officers exceeded the scope of that consent.  See United States v. Glover, 104 F.3d 1570, 1584 (10th Cir. 1997) (finding consent to search voluntary based

in part on fact one defendant gave her house keys to officers and both defendants told officers where they could find certain items in the home).

### C.  Statements Made by Defendant

Finally, Henderson challenges the statements made by him on March 10, 2008.  A defendant may knowingly and intelligently waive his rights and agree to answer questions.  Miranda v. Arizona, 384 U.S. 436, 479 (1966).  When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant.  Colorado v. Connelly, 479 U.S. 157 (1986).  The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it.  Moran v. Burbine, 475 U.S. 412 (1986).  The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne.  Connelly, 479 U.S. at 170;  Haynes v. Washington, 373 U.S. 503 (1963).  "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry."  Dickerson v. United States, 530 U.S. 428, 444 (2000).  As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda, are

rare." Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984). See Dickerson, 530 U.S. at 444.

Prior to making his statements at the Sieloff apartment, Defendant was orally advised of his Miranda rights and voluntarily agreed to waive those rights. As discussed above, at the time, he was not under the influence of drugs or alcohol, appeared to understand what was being requested, and was not threatened or coerced in any way. His initial statements were made shortly after his arrest, inside a residence he used, and during the daytime. At DEA headquarters, Defendant was interviewed more thoroughly and provided further cooperation to the agents. That interview began shortly after his arrest, and prior to the interview he was advised a second time of his Miranda rights. Based on the totality of the circumstances, the Court finds Defendant knowingly and voluntarily waived his rights and made voluntary statements both at the time of the arrest and consent search, and later at DEA headquarters. See United States v. Gaddy, 532 F.3d 783, 788 (8th Cir.), cert. denied, __ S.Ct. __, 2008 WL 4580035 (U.S. Nov. 10, 2008) (finding waiver of Miranda rights and confession both voluntary where officers entered home at 5:30 a.m. to execute search warrant and arrest warrants, defendant was recently awakened, and was handcuffed at the time waiver was signed); United States v. Castro-Higuero, 473 F.3d 880, 886-87 (8th Cir. 2007) (finding Miranda waiver and post-arrest statement made at detention center, at 3:15 a.m., approximately one hour after arrest, to be valid and voluntary where substance of Miranda rights was communicated to defendant through Spanish interpreter, agent was unarmed and in street clothes, and

defendant was not restrained).

Defendant grounds his motion to suppress primarily on his contention that his statements were the result of promises made to induce his cooperation. But Defendant's arguments are unfounded. There is simply no evidence in this record to support his contention that any promise of probation or of any particular sentence was made to Defendant on March 10, 2008 in connection with Henderson's waiver of rights or the statements and cooperation that followed thereafter. The only evidence of any discussion about a possible sentence took place the following day, in the presence of defense counsel, and it is undisputed that Henderson was advised at that time that there was no agreement being made at that time and that any agreement could only be made by the prosecutor. The agents' statements to Henderson that it would be in his best interest to cooperate, that the more he cooperated the better, and their promise to make known to the prosecutor the cooperation he provided, do not serve to render Defendant's waiver involuntary. See, United States v. Astello, 241 F.3d 965, 967-68 (8th Cir. 2001) (holding that analogy about train leaving station and those who told the truth would be on the train not coercive); United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995) (finding defendant's mistaken belief that he had been promised leniency would not render confession involuntary); accord United States v. Mashburn, 406 F.3d 303, 309-10 (4th Cir. 2005) (holding confession voluntary though agents told defendant he faced a 10-year sentence and the only way to reduce the sentence was to cooperate); United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002) (noting that neither a promise of

leniency, an expressed disbelief in defendant's statements, nor lies to the defendant about the evidence against him will necessarily render a confession involuntary); United States v. Gaines, 295 F.3d 293, 299 (2d Cir. 2002) (finding statement voluntary though agent promised to make defendant's cooperation known to prosecutor and judge).  Here, there is nothing to suggest that Defendant's will was overborne.  In light of all of the circumstances, the Court finds that Defendant knowingly and voluntarily waived his rights under Miranda, further finds that the statements made both at the residence and at DEA headquarters were voluntary and were not the product of any coercion or promises.

## II.  MOTIONS TO SEVER DEFENDANTS FOR SEPARATE TRIAL

Defendants Henderson and Turrentine have each filed motions requesting that the claims against them be severed for separate trial.  Severance of defendants is appropriate under Bruton where the government intends to introduce a co-defendant's extrajudicial confession and that confession directly incriminates another co-defendant.  Bruton v. United States, 391 U.S. 123, 137 (1968); United States v. Richards, 241 F.3d 335, 341 (3d Cir. 2001).  The government has asserted here that it intends to use the statements of Defendant Henderson at trial, and that his statements directly implicate Defendant Turrentine.  The government further asserts that the statements cannot be redacted in a manner that would eliminate the problem.  See Richardson v. Marsh, 481 U.S. 200, 208-09 (1987) (finding no Bruton violation where co-defendant's confession incriminated the defendant only when linked with other evidence introduced at trial); United States v. Richards, 241 F.3d at 341 (finding Bruton violation where co-defendant's statement

19

incriminated himself and his "friend" and defendant was easily identified as the friend).

In light of the government's representations, the undersigned recommends that each of the

Defendant's motions for severance of defendants for separate trial be granted.

### III.  DEFENDANT TURRENTINE'S MOTION FOR SEVERANCE OF OFFENSES

Defendant Turrentine has filed a motion to sever Count I for separate trial from

Counts III through VI, asserting that joinder is not proper and that a joint trial of Count I

with the other offenses will prejudice him.

Count I of the superseding indictment charges that during the period from June

2006 through March 2008, Defendants Henderson and Turrentine and others engaged in a

conspiracy to distribute and possess with intent to distribute in excess of five kilograms of

cocaine, in violation of 21 U.S.C. § 841(a)(1).  Counts III through V are asserted against

Defendant Turrentine only.  Count III charges that during the period beginning before

December 2006, and continuing to and including March 2008, Turrentine conspired with

others to engage in money laundering, involving the purchase of United States Postal

money orders that were shipped from St. Louis to California and elsewhere, which

involved the proceeds of specified unlawful activity, including (i) a conspiracy involving

the unlawful structuring of financial transactions and (ii) a conspiracy to distribute

cocaine, all in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h).  Count IV charges

that during the same time period as Count III, Defendant Turrentine conspired with others

to structure financial transactions in order to evade the reporting requirements of 31

U.S.C. § 5313(a), by purchasing Postal money orders with cash, in violation of 18 U.S.C.

§ 371.  And Count V charges that on three dates in 2007, Defendant unlawfully

structured financial transactions, involving multiple purchases of Postal money orders, in

violation of 31 U.S.C. § 5324(a)(3) and 5324(d).  Count VI seeks criminal forfeiture of

certain real and personal property, including but not limited to the funds seized from the

Sieloff and Bon Jour addresses on March 10, 2008, which are discussed above.

"When a defendant moves for a severance, the [Court] must first determine

whether joinder is proper under Federal Rules of Criminal Procedure 8.  If joinder is

proper, the Court still has discretion to order a severance under Federal Rules of Criminal

Procedure 14."  United States v. Darden, 70 F.3d 1507, 1526 (8th Cir. 1995).  These rules

are to be liberally construed in favor of joinder.  Id.; United States v. Rock, 282 F.3d 548,

552 (8th Cir. 2002).

Rule 8(a) provides that the indictment may charge a defendant in separate counts

with two or more offenses if the offenses charged "are of the same or similar character, or

are based on the same act or transaction, or are connected with or constitute parts of a

common scheme or plan."  See United States v. Moeckly, 769 F.2d 453, 464-65 (8th Cir.

1985).  The determination of whether joinder is proper is made from the face of the

indictment, United States v. Bledsoe, 674 F.2d 647, 655 (8th Cir. 1982),[6] and is reviewed

_____

[6] But see, United States v. Grey Bear, 863 F.2d 572 (8th Cir. 1988) (en banc) (5-5
decision, with Court equally divided on whether indictment must reveal on its face a
proper basis for joinder); United States v. Francis, 367 F.3d 805, 830-31 (8th Cir. 2004),
vacated on other grounds (Booker), 543 U.S. 1180 (2005) (joinder of multiple conspiracy

<u>de</u> <u>novo</u> on appeal, <u>United States v. Tyndall</u>, 263 F.3d 848, 849 (8th Cir. 2001).  Among the factors the courts examine is the extent to which the evidence related to the different counts overlaps.  <u>Id</u>.; <u>United States v. Davis</u>, 103 F.3d 660, 676 (8th Cir. 1996) (holding joinder proper where the counts refer to the same type of offenses, over a relatively short period of time, and the evidence is overlapping).  Joinder of all offenses against a defendant in a single trial is favored, and as such, the rules are construed liberally in favor of such joinder.  <u>United States v. Moyer</u>, 313 F.3d 1082, 1085 (8th Cir. 2002).

The government asserts that joinder is proper here because the drug conspiracy and the money laundering and structuring offenses are constituent parts of a common plan or scheme.  Essentially the same time periods are involved, and the indictment specifically alleges the conspiracy to distribute cocaine as one of the specified unlawful activities the money laundering conspiracy was designed to promote.  As such, the government contends that in a trial of Counts III - VI, it will need to prove both the fact of the cocaine conspiracy and that the conspiracy generated proceeds which were then used in the money laundering and structuring offenses charged.  Specifically, the government has alleged that the evidence in the case will demonstrate that Turrentine generated significant sums of currency through his cocaine dealings with Defendant Henderson and others, which funds were used to facilitate the conspiracy, and further, in order to conceal the funds from detection, the shipments were structured through the

---

charges held proper where evidence at trial demonstrated sufficient connection).

22

purchase of money orders under the $3,000 reporting threshold.

The Court finds that joinder is proper here, as the cocaine conspiracy and the money laundering and structuring activities are all constituent parts of a common scheme. See United States v. Nettles, 476 F.3d 508, 516 (7th Cir. 2007) (joinder of counterfeiting with planning to attack federal building held proper because counterfeiting intended to fund attack); United States v. Boulanger, 444 F.3d 76, 87 (1st Cir.), cert. denied, 127 S.Ct. 235 (2006) (holding joinder of robbery involving controlled substances and drug distribution charges proper where robbery in order to distribute pills and distribution were part of a common scheme); Moyer, 313 F.3d at 1085 (holding charges of concealment of material facts to SBA and bank fraud properly joined with money laundering, reporting requirements, and forfeiture charges, as latter were attempts to solve financial difficulties at issue in fraud counts). Further, the degree to which the evidence in support of the charges overlaps is an important factor in assessing the propriety of joinder. Boulanger, 444 F.3d at 88. Here, the government alleges that it will prove that the funds used in the financial counts involved the proceeds of, and that the transactions were in furtherance of, the cocaine conspiracy alleged in Count I. As such, the Court finds that joinder is proper under Rule 8(a). See Moyer, 313 F.3d at 1085.

In his memorandum in support of his motion, Turrentine does not argue that joinder is improper. Rather, he asserts that he will be prejudiced from a joint trial of the charged offenses. Even when joinder is proper, Rule 14 provides that the court may order separate trials of counts or provide other relief if the joinder of offenses appears to

23

prejudice the defendant or the government. Fed. R. Crim. P. Rule 14(a). The determination of whether to grant or deny severance is committed to the sound discretion of the trial court, and requires a balancing of the interest in judicial economy against the risk of prejudice. Zafiro v. U.S., 506 U.S. 534, 541 (1993); United States v. Felici, 54 F.3d 504, 506 (8th Cir. 1995). Severance may be appropriate under Rule 14 where damaging evidence related to one count would not be admissible in a separate trial of the other count. United States v. Aldrich, 169 F.3d 526, 528 (8th Cir. 1999).

Defendant asserts that severance is necessary in this case because in a joint trial he would be prejudiced by the fact that: (1) the jury may believe a defendant charged with a large number of offenses has a criminal disposition, and may therefore improperly combine the evidence against him; (2) the jury may tend to lessen the presumption of innocence; (3) evidence of one count may improperly "spill over" to other counts; and (4) Defendant may wish to testify in his own defense on one charge but not the other.

A joint trial of the charges here will clearly promote judicial economy; in a separate trial of Counts III - VI, the government would need to repeat the evidence regarding the cocaine conspiracy charged in Count I, and prove Defendant Turrentine's involvement in that conspiracy. Further, evidence of the money laundering activities might be deemed admissible under Rule 404(b) in a separate trial of the cocaine conspiracy. The Court is thus unpersuaded by Defendant's first three arguments. As the Court noted in United States v. Boyd, 180 F.3d 967, 982 (8th Cir. 1999), "a defendant does not suffer any undue prejudice by a joint trial if the evidence is such that one crime

24

would be probative and admissible at the defendant's separate trial of the other crime."

Moreover, the charges involving the money laundering and structured transactions are

sufficiently different in nature from those related to the cocaine conspiracy, that the jury

should not have any problems compartmentalizing the evidence. And any prejudice due

to alleged "spillover" may be addressed by proper jury instructions. See United States v.

Hively, 437 F.3d 752, 765-66 (8th Cir. 2006); United States v. Lore, 430 F.3d 190, 206

(3d Cir. 2005) (finding no prejudice where court instructed jury several times to

compartmentalize evidence and consider each count separately).

Finally, Defendant asserts that severance is necessary because he intends to testify

with respect to Count I, in order to deny his involvement in a cocaine conspiracy with

Defendant Henderson, but may not elect to do so with respect to Counts III - VI. He cites

Cross v. United States, 335 F.2d 987, 989 (D.C. Cir. 1964), for the proposition that

severance of joined offenses may be necessary to avoid prejudice when a defendant

wishes to testify regarding some counts, but to invoke his Fifth Amendment right to

remain silent with regard to others. The government nowhere addresses this argument,

and neither of the parties addressed this particular argument at the hearing on October 7,

2008.

On the current record, Turrentine's argument fails for two reasons. First,

Defendant fails to make the required showing for severance on this ground. "[W]hile the

courts zealously guard a defendant's Fifth Amendment right not to testify at all, the case

law is less protective of a defendant's right to testify selectively. . . .'" United States v.

Fenton, 367 F.3d 14, 22 (1st Cir. 2004) (quoting United States v. Alosa, 14 F.3d 693, 695 (1st Cir. 1994)).  To justify severance on this basis, the Eighth Circuit has held the defendant must make a "persuasive and detailed showing regarding the testimony he would give on the one count he wishes severed and the reason he cannot testify on the other counts."  Closs v. Leapley, 18 F.3d 574, 578 (8th Cir. 1994) (quoting United States v. Possick, 849 F.2d 332, 338 (8th Cir. 1988)); accord United States v. Lindsey, 782 F.2d 116, 118 (8th Cir. 1986) (severance is warranted only when a defendant "has made a convincing showing that he has both important testimony to give concerning one count and a strong need to refrain from testifying on the other"); United States v. Agboola, No. 00-100-JRT/FLN, 2001 WL 1640094, at *8 (D. Minn. Oct. 31, 2001).  This is consistent with the approach taken by other circuits.  See, United States v. Ervin, 540 F.3d 623, 629 (7th Cir. 2008) (holding, "[a] defendant's 'general assertions' about the testimony he seeks to offer will not suffice; he must proffer 'specific examples of the exculpatory testimony' that he would give but for the joinder of counts") (citations omitted); United States v. Jones, 530 F.3d 1292, 1300 (10th Cir.) cert denied, __U.S.__, 2008 WL 4537534 (2008) (requiring Defendant to make a showing that he has important testimony concerning one count and a strong need to refrain from testifying on the other); United States v. Sampson, 385 F.3d 183, 191 (2d Cir. 2004) (same; citing cases); Fenton, 367 F.3d at 22 (holding defendant must make a particularized offer of proof showing that he has "salient testimony to give anent one count and an articulable need to refrain from giving testimony on the others").

26

Here, Turrentine has failed to make the type of particularized showing that is required.  Indeed, he has not even committed to a desire to exercise his Fifth Amendment rights with regard to Counts III-VI, stating only that "he may decide not to testify on the money counts."  Doc. #94, p. 5.  This is not enough to justify severance.[7]  See Jones, 530 F.3d at 1300 (holding denial of severance proper as Defendant's stated desire not to testify and to require government to meet its burden of proof with respect to bank fraud and conspiracy counts was not sufficient to meet her burden to establish strong need to refrain from testifying regarding those counts); United States v. Smith, No. 96-1729, 107 F.3d 876 (Table), 1997 WL 76194, at *1 (8th Cir. Feb . 25, 1997) (holding the defendant did not make the showing necessary for severance based on general statement that he did not want to testify regarding Count III, because the testimony might be used by the state if it refiled murder charges against him, but did want to testify regarding Counts I and II); Agboola, 2001 WL 1640094, at *8 (holding defendant's statement that he can envision testimony in the obstruction case but that it could be concluded that he would not want to testify in the conspiracy case, was not sufficient to support severance).

Second, the ruling in Cross has been applied only where the joined offenses are "clearly distinct in time, place, and evidence."  Sampson, 385 F.3d at 191 (quoting Cross, 335 F.2d at 989); accord United States v. Corbin, 734 F.2d 643, 648 (11th Cir. 1984).  Its rationale has been held inapplicable when there is "a significant connection between the

---

[7]  The District Court could revisit the need for severance should Defendant make a more particularized showing prior to or at the time of trial.

joined offenses." United States v. Moses, No. 1:05-CR-133-01, 2008 WL 794466, at *2 (D. Vt. March 24, 2008). Thus, in Possick, the Eighth Circuit upheld a refusal to sever on this selective testimony basis where evidence of the defendant's guilt on the drug charges would be admissible in a separate trial on the continuing criminal enterprise (CCE) charge, just as evidence of defendant's relationships with his subordinates and the amount of cocaine, pertinent to the CCE count, would be admissible in a separate trial on the other counts. See Possick, 849 F.2d at 338; accord, Corbin, 734 F.3d at 648. On the current record it appears that the evidence of Count I will substantially overlap with the other counts Defendant seeks to sever, and that proof of the conspiracy alleged in Count I would be an integral part of any separate trial on the remaining counts. For this reason, as well, the Court recommends that the motion to sever be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Henderson's Motion to Suppress Statements and Physical Evidence [Doc. No. 108] be **Denied**.

**IT IS FURTHER RECOMMENDED** that Defendant Henderson's Motion to Sever Defendants [Doc. No. 92] be **Granted**.

**IT IS FURTHER RECOMMENDED** that Defendant Turrentine's Motion to Sever Defendants [Doc. No. 93] be **Granted**.

**IT IS FURTHER RECOMMENDED** that Defendant Turrentine's Motion to Sever Offenses [Doc. No. 94] be **Denied**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 12th day of November, 2008.